And when you're ready, Mr. Lynn. Thank you, Your Honor. May it please the court and counsel. My name is Eric Lynn. I represent the petitioners Wachupongo and Yuliaty Henoch in this matter today. I would also like to reserve three minutes for rebuttal. Mr. and Mrs. Henoch are seeking political asylum and withholding of removal in this matter. I would submit that the record in this case compels this court to grant political asylum and or withholding to petitioners. First of all, Mr. and Mrs. Henoch were deprived of the opportunity to have this appeal heard by the BIA, and that's a critical issue in this matter. The reason that they were deprived of this opportunity was because they were abandoned by their previous counsel days before the appellate brief was due to the board. The previous counsel had requested one extension for submission of the brief. The BIA granted an additional three weeks, as is their standard practice. Days before the second deadline, the counsel then moved to withdraw from the matter. Mr. and Mrs. Henoch then submitted a second request for an extension pro se, articulating the reasons, and the board did not address that motion until they issued the denial of the appeal. Can I pin that down a little bit? That concerned me. The prior counsel withdraws, and there's a period of time between that time and when the BIA act. How much time was that? I believe it was a matter of a few months. I don't know the exact dates. So Henoch knew from the time that he withdrew, the time that the BIA acted, they had to do something or had to request something. However, when did they file the second, the notice for the extension? It was days before the end of the time when the brief was due, I think, wasn't it? They filed it right the day before. Day before. The brief was due, was when the request was made. Even though it was three months in between the time they lost counsel. Let me just state the dates so we're clear. The second deadline was July 26th, and the BIA received counsel's motion to withdraw the day before, on the 25th. That same day, July 25th, the day before the brief was due, Mr. and Mrs. Henoch submitted their pro se request for extension. What did the BIA do the day before? The BIA didn't do anything the day before. They said something and they refused counsel. Counsel's motion was received by the board the day before the deadline. So he withdrew from representing them the day before the briefing was to be completed? Correct. He mailed it the week before it was received the day before. What was the three-month period we were talking about? The decision of the board. I misunderstood you. It's my fault. So about a week before the brief is due, he gives notice. He wants to withdraw. Correct. Two days before it's due, the board grants that? The board receives that. Receives it. Right. The next day, the Henochs apply for an extension. Correct. The next day they get a decision. A month later. A month later. And at the same time they denied the appeal without opinion, affirming the immigration judge without opinion, they noted that they grant the motion to withdraw. Now I've got it. That clears it up. Thank you very much. And I would submit, Your Honor, that that's a critical issue, because as counsel for the government notes, this Court doesn't have jurisdiction to review the immigration judge's denial of political asylum. Is the remedy for that to remand and tell them to allow a new brief? I think that's exactly what the remedy is, Your Honor, because, as I was saying, the BIA does have jurisdiction to review the immigration judge's denial of asylum for reasons of the one-year deadline. This Court doesn't have jurisdiction to review that. And that's clear prejudice to Mr. and Mrs. Henoch, that they did not have the opportunity to submit this issue to the Board, and now they have lost that opportunity. Are those the only facts in the record? In other words, there's no other facts with regard to knowledge or conflict with counsel or counsel didn't know if item advanced? I didn't see anything in the record. I believe that's all that's in the record. I can speculate if the Court wants, but that's all that's in the record. The attorney does not specifically state reasons for his withdrawal. Now, if this case proceeds to the merits, I would also argue that the record compels that this Court find that there was past persecution in this case. This was a case that involved genital mutilation of Mrs. Henoch when she was a child. What's the tie between the genital mutilation, which occurred when she was living with her Muslim family, and they were fully Muslim, she later converts to Christianity some years later, what's the tie between the claim that she's being persecuted as a Christian and the years before FGM when she was living with her family as a Muslim? I fail to see any tie. Well, I'm not sure there has to be a tie, Your Honor. I think, first of all, this Court, there's separate grounds for granting this case. First, the Court can grant it on the basis that Mrs. Henoch has established past persecution on the basis of genital mutilation. But her claim is she was persecuted because she was Christian. Isn't that what she's claiming now? That's the second aspect of the claim. Now, if you look at it from the perspective of a woman who had to undergo this procedure She then later grows up and decides that this is not what she wants for her children. She meets a man who happens to be Christian. They get married, or she converts, and then they get married. The tie is in her mind and in her heart because this is what she had to do. You don't have to win on that to win, though, do you? Because they also were persecuted on account of being Christian. Correct. And being beaten up and run through with a spear and various other things. Right. And so it's a separate ground. You almost have alternative means to grant this. Do you think the record compels a conclusion in your favor without regard to the credibility question? I certainly do believe that, Your Honor, because the immigration judge downplays the genital mutilation. He missed the fact. He focused only on the credibility question about the There was a question in his mind whether it was a full mutilation or only a symbolic pinprick. Correct. But looking at the rest of the credibility issues, do you think that you win even if we don't resolve those credibility issues in your favor? I think the credibility issues are also misguided. As I stated in my brief, they were based on factual errors. But so I'm hoping the court does resolve the credibility issues in my favor, even if they don't. What the immigration judge did is that he missed the detailed affidavits submitted by both Mr. and Mrs. Hanock, which stated that. Let's say that we agree with you on the credibility problems that the I.J. Does that mean you win? Or does that mean that it gets remanded with instructions to do the credibility thing right and now look at the record and see if they win? Well, I think the record does support the fact that Mr. and Mrs. Hanock have established persecution that justifies the grant of asylum. One is on the basis of the genital mutilation. The other is on the basis of the their religious persuasion. So you have about a minute and a half if you want to reserve the remainder for rebuttal. I would like to. I'd have one question that may run you run you over. On the convention against torture argument, I was looking at your brief. And as best I could tell, you dedicated two lines that to that argument on page twenty seven. The BIA did not addressing Mr. and Mrs. Hanock's applications for relief under the convention against torture. That's the totality of the argument. That's not our strongest point. And I will readily court's process is that is not an argument that we would ordinarily consider. I think what this court should focus on is the political asylum and the withholding of removal. All right. Thank you, counsel. Mr. Thank you. Let me just go to the first point about the issue about the failure to grant the extension. That's very important to me. I asked the question if there's anything in the record besides what counsel referred to. Is there anything more in the record? There's something a little more. If you look at page four of the administrative record, this is the notice denying the extension. It says there, please note, it says, if you file your brief late. So they're saying, you know, we've denied this extension. You can file the brief late with a motion for consideration of your late brief explaining the compelling circumstances. They didn't do that. So they didn't have counsel. They knew they didn't get the extension. They were told by them they could file this late brief with compelling circumstances explained by motion. And they didn't do it. They never sought to reopen the case. They were pro se at that time, correct? Well, they could have obtained it. It was a whole month period before then. The BIA didn't have any brief from them. They didn't answer my question. Were they pro se at that time? I don't know when they obtained new counsel, Your Honor. They had just lost their counsel previously. And there was a motion for extension, which they did pro se. I don't know what point they obtained counsel. But they received this notice on 729 from the board saying that they had this opportunity to still file a late brief with an appropriate motion. And they didn't do that. And then we have a decision not just saying they defaulted and therefore not hearing the case. It's actually addressing, affirming on the merits of the immigration judge's ruling. Under the board's rules, they could have just said it was a default, but they didn't do that. They addressed the merits based upon the notice of appeal, which actually did raise the substantial issues in how they were going to challenge the immigration judge's ruling, and they affirmed based on the record. There's no due process violation in that context. But even so, the remedy would be for them to seek to reopen and to show that their due process right has been violated due to the unfair counsel or inadequate counsel. And, you know, there's standards that this Court has adopted for an alien to meet to show inadequate representation and prejudice. They haven't done any of that here. They're just making a sort of naked assertion that this was a due process violation just because the V.I.A. ruled on this without their brief. They do in their reading here the declaration that's part of the motion and declaration for extension of time. They indicate they are searching for new representation, which is not easy and is causing great burdens. We respectfully ask for a little longer to seek another attorney and file our brief. The brief is now supposedly due July 26th. We ask for extension up to September 15th. Now, within that, and that was filed on the 23rd of July. The V.I.A. ruled in August. Well, August 29th. So we had that whole month. So they asked for basically a 45-day period. It was still a 30-day period before the ruling where basically they were instructed they could still. And there's nothing in the air indicating they're still looking for counsel or we can't find counsel or we're trying to do a brief. That's the only thing in the record. Right, Your Honor, on that point. I want to ask you a question about the merits, assuming that we get there. And I'm speaking, of course, only for myself on this. It would appear to me that the adverse credibility finding is not supported by the immigration judge. Do you agree that if that is the case, if the adverse credibility finding is defective, that our court's precedent requires us to view the testimony of the petitioners as credible and proceed from there? I agree with that. I think one of the questions earlier was would it be then appropriate to remand for the immigration judge and the board to assess whether with that credible testimony it met past persecution. And I think that would be the appropriate course. But do you agree that many of our cases, if we first told that the credibility, adverse credibility finding was no good, that we simply say the remedy for that is that they must be deemed credible and that we sometimes continue to analyze those cases? Well, you can only continue if the evidence compels one result. And the Supreme Court in Ventura said that that should be a very limited circumstance, Your Honor. But let me get to that credibility determination. And I think the immigration judges really didn't depend necessarily on that credibility determination. First is the credibility. We're talking about the attack by the so-called Lascar Jihad, a group which didn't exist in 1998 during the alleged attack. And we have on page 104 of the administrative record the petitioners here admitting they learned about the practices of the Lascar Jihad in reading about them in the newspaper. They claim they were speared, as you said, by it. But that was the wife's testimony. The husband doesn't really play that up. The wife said he was terribly injured. He says he didn't even have medical treatment, never went to the hospital. So there's very much an inconsistency here about what happened. But what the immigration judge also said, and what the record supports, is even if you believe that they were attacked by this group of radicals, as soon as the authorities showed up, the attack stopped. So like all their claims here, there's no basis for attributing the discrimination and harassment they allege to the state. We have alleged harassment by the family, and we have this one attack, single attack by the alleged attack by the Lascar Jihad, which also, if you look at the record, would stop once the authorities did arrive. So there's no – the immigration judge even – which is why I doubt the credibility, but went on to say – you know, I think a fair reading of it is that the immigration judge is saying that it's not fair to attribute this to the state in any event. Mr. Henock, how do you see the record as far as the likelihood of future persecution given the apparent or perhaps ability of the petitioners to relocate if they did return? Well, it's their burden to suffer a future persecution in the entire country, not in any particular location. And Mr. Henock's family, who lives in, I think, Mondano, has said they've lived their entire lives with a very large family, regularly attend churches as Seventh-day Adventists, and have never had any problem attending church or been persecuted based upon their practice of their religion. There's a substantial population of Seventh-day Adventists, over 10 million Christians in the country, and the immigration judge here probably – based on that record, there is certainly substantial evidence to support the immigration judge's finding there's a – they haven't met their burden of showing they'll be subjected to future persecution in Indonesia. What's the standard for relocation potential for avoiding persecution in deciding whether or not there's a reasonable probability of – Well, it depends under the regulations. If there is a – if there's no showing of past persecution, then basically the – it's the alien's burden to show they can't live anywhere in the country without being persecuted. That's what the regulations say. If they show past persecution, then the burden shifts to the agency to show that they will be able to move to a reasonable location, and there's a list of various factors in assessing whether it's reasonable to require them to move to that location in the country. So it depends on whether there was past persecution or not. How do you see the record – assuming without agreeing that we decide that there's a showing of past persecution, how do you see the record as to whether the agency met its burden on moving around as a way to avoid future persecution? Well, the record here regarding the past persecution shows it was largely from her family, which was in Jakarta, and that – and there's – and the immigration agency showed that in Mandano and other places in Indonesia, Seventh-day Adventists live – are unable to practice their religion without persecution, without harassment, and show that there are numerous converts in the country that in this – in that year at Bard, 1995, there were more than 500 converts to Seventh-day Adventists, and there's thousands of converts to different Christian faiths, and there's nothing in the record to show that converts are persecuted in Indonesia generally. When you compare that to the State Department report in Iran, which shows that level of persecution of converts, there is no, in the State Department report here, showing of singling out and persecution of converts. So perhaps, you know, the record, if you want to attribute her family's actions to the state, which I don't believe is supported by the record, that is in Jakarta, not all over. Now, you know, they could claim that they will be tracked down no matter where they are, but that's really just a matter of speculation, which I don't think – Let me explore that a little bit, because like Judge Nelson, I have a little problem with that. What you're saying is the only record here that shows that Seventh-day Adventists are not persecuted generally in Indonesia is the country report? Well, we also have the testimony here of Mr. Hanak regarding his family, a large extended family, and that they can regularly attend services, and that they were not aware of any problems of them or their friends, I think, attending service on a regular basis and practicing their religion. And there's nothing that they submit in the record regarding a general problem in the country about persecution of converts. So then the flip side of it is you're saying that the Petitioners didn't show that anywhere they go, that they can't go anywhere in the country where they would be safe from persecution as practicing as Seventh-day Adventists. Is that what you're saying? If I follow that, I think – I've got to go both ways. I'm just trying to find both ways, because you're saying that Mr. Hanak's family freely practiced their religion without persecution. Where? In Jakarta? In the Madano. Madano. Right. Okay. Which is where his family is, and I don't think it's unreasonable to say they could relocate there. I think their only claim about being unsafe is that they'd be tracked down by the brothers, who are upset about the conversion and about the intermarriage. The brothers' actions, not the – Not the state's actions. And there's no – nothing in the record that shows the state is actively seeking out Seventh-day Adventists. Absolutely not, Your Honor. No further questions? I think we have no further questions. Mr. Lynn will give you the bottle time here. I'm not sure what's left. About a minute, I think. To address that last point, Your Honor, I think the issue is that even if it is only the brothers that are persecuting Mrs. Hanak, the record does contain evidence to show that the government of Indonesia is not effective, is not willing to protect her. Protect her from her brothers? Correct. Criminal acts of her brothers? From her brothers, from radical Muslim groups, from anybody, really, who's persecuting her, all the persecutors that we've articulated here. In fact, the State Department's reports do allege that there have been accusations that the government itself is involved in some of these anti-Christian activities. On the issue of relocation, I think the State Department report also addresses the fact that there are – there is a concern over relocation of Muslims into formerly Christian areas. So I think that covers a lot of the country. The country is 90 percent Muslim. So I think – Are you saying, then, the questions we asked before of counsel, that you can't go somewhere else in the country – Correct. – and be safe, and that's coming out of the country report? Correct. I think that's – I think that's all I have, Your Honor. Okay. Thank you very much for your arguments. The case just argued is submitted. And we will turn next to Tsoi v. Ashcroft and Mr. Shumlow.
judges: Brunetti, Tg Nelson, Graber